UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMANDA LANDIS, Personal
Representative for the Estate of CHARLES       Case No. 2:05-cv-74013
CHRISTOPHER KEISER, Deceased,

                                               HONORABLE STEPHEN J. MURPHY, III
          Plaintiffs,

v.

GREG GALARNEAU, et al.,

          Defendants.
_____/

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (docket no. 73)

This is a civil rights case in which the pursuit and apprehension of a fleeing suspect

resulted tragically in the death of that suspect.  Charles Keiser, in a fit of apparent mental

instability, moved construction equipment to block traffic on US-23 in Livingston County on

a snowy Thanksgiving morning in 2004.  Keiser fled from various officers who attempted

to arrest him and he died in a struggle with several law enforcement officers after being

tasered while restrained in over a foot of water, mud and sediment.

Plaintiff filed this suit against Livingston County and various officers of the Michigan

State Police and the Livingston County Sheriff's Department on October 17, 2005, alleging

that the defendants violated Charles Keiser's civil rights and that they committed assault

and battery on him.  The defendant officers moved for summary judgment based on

qualified immunity in June 2007.  The Court denied qualified immunity to the individual

officers on September 28, 2007.  Defendants filed an interlocutory appeal to the Sixth

Circuit and the Sixth Circuit affirmed in an unpublished opinion dated October 16, 2008.

Following remand, defendants Livingston County, Jim Lynch and Jason Baker settled

with the plaintiff and were dismissed from the case, leaving Officer Greg Galarneau as the

the sole remaining defendant.  Galarneau is alleged to have hit Keiser with a baton in the legs ten times, to have told Deputy Lynch, another former defendant, to taser Keiser while he was standing in the muddy water, and to have kneeled on Keiser's back, with Keiser's face allegedly in the water, while the officers were trying to arrest him.  Plaintiff now moves for partial summary judgment on liability against Officer Galarneau, arguing that, in light of the Sixth Circuit holding, there are no material factual issues and the plaintiff is entitled to partial summary judgment on liability as a matter of law.

## FACTS

The following facts are taken from the Sixth Circuit opinion affirming the denial of qualified immunity to the defendants:

On the morning of November 25, 2004, several motorists called Livingston County 911 Central Dispatch to report that a bulldozer was blocking the two southbound lanes on US-23 near-59 in Hartland Township. Callers described a white male with long blond hair and a brown jacket running down the median in a southbound direction away from the bulldozer. Trooper Cardoza and Livingston County Sheriff Deputy Oswalt were dispatched to the scene at 8:37a.m. Trooper Cardoza arrived first, and, noticing the precarious position of the bulldozer which was perched near the crest of the hill, he asked Oswalt to shut down southbound US-23.

Cardoza continued down US-23 until he noticed a man matching the 911 callers' description trying to enter a large front and rear loader in the median of the highway, south of the bulldozer. After exiting his vehicle, Cardoza approached the man, Charles Keiser, a forty-seven year old resident of Oakland County, Michigan. When asked to stop by the officer, Keiser "muttered something about God" and ran towards traffic heading northbound on US-23, eventually crossing the freeway toward a fence separating US-23 from Blaine Road. Because Keiser would not stop as ordered, Cardoza sprayed him in the face with pepper spray but Keiser managed to climb the fence and continued running away from Cardoza.

Another Michigan State Trooper, Greg Galarneau, who had been alerted to the situation, arrived on Blaine Road and saw Keiser walking southbound towards him. However, when Keiser looked up and noticed Galarneau, he began running back towards Trooper Cardoza, who by now had climbed the fence and was running down Blaine Road. Despite verbal commands to stop, Keiser continued running until Trooper Cardoza was able to tackle him to the ground. Galarneau then arrived and assisted Cardoza in trying to handcuff and restrain Keiser.

At some point, Keiser was able to roll over and grab Galarneau by the throat [1]FN3. Noticing that Galarneau was having difficulty breathing, Cardoza retrieved Galarneau's baton and struck Keiser with it in the forearms and thighs. Galarneau then sprayed his pepper spray in Keiser's face which caused him to release his grip on Galarneau's throat. Keiser then stood up and walked into the nearby woods. At 8:48 a.m., Galarneau radioed in to dispatch to report that "this guy [Keiser]'s on something, man" and that "nothing can stop him at this point." Galarneau then requested back up from a county officer with a taser.FN4[2]  Neither Galarneau nor Cardoza had been trained in the use of a taser, and they were not authorized to carry one.  After calling in for a taser and backup, Galarneau and Cardoza followed Keiser into the woods until Keiser stopped in a swampy area. Keiser had not spoken to the officers and "gave no verbal resistance." He was not armed when the officers approached him in the swamp.

At 8:51 a.m., Deputy Lynch who had been listening to the radio traffic, relayed to the dispatcher that he was in possession of a taser and would be heading out to meet the other units. Deputy Baker was also alerted to the situation and arrived on the scene prior to Lynch. At this point, Trooper Galarneau was positioned approximately twenty feet to the east of Keiser, with Trooper Cardoza on the west side of Keiser. As Baker approached the scene, he saw Keiser in a "water hole, just standing, not swaggering, not pacing, not doing anything, just standing." Keiser had his hands in the water, as though he were searching for something, but in a very slow and methodical manner. Baker referred to Keiser as "very lethargic, almost like 'Frankenstein.' " Baker tried to talk Keiser into giving himself up and coming out of the water. He asked Keiser "his name, where he was, what day it was, etc." but "Keiser had nothing but a blank stare on his face and looked right through [Baker]."

Shortly thereafter, Deputy Lynch, along with Deputy Schuster, arrived on scene and asked Keiser to take his hands out of his pockets at least three times. Keiser did not

---

[1]FN3. There is a factual question as to how this occurred. In his statement, Cardoza indicates that the officers and Keiser were positioned on an embankment and began sliding, which allowed Keiser the opportunity to free his hands. According to Cardoza, Keiser then began choking Galarneau with both hands for approximately 15 seconds. Detective Gregory Poulson reports in his incident report, that the officers were unable to control Keiser and he "threw them off of him." He further states that as Galarneau was holding Keiser's left arm, Keiser grabbed Galarneau's throat with his right hand and began choking him.

[2]FN4. A " 'taser' is an electronic device used to subdue violent or aggressive individuals. By pressing a lever, a high voltage electrical current is transmitted through a wire to the target." *Nicholson v. Kent County Sheriff's Dept.*, 839 F.Supp. 508, 515, n. 4 (W.D.Mich.1993). The "advanced tasers" like the one used by Deputy Lynch not only "stun the target; they directly control the muscles, causing an uncontrollable contraction." The taser can be used to either shoot 2 probes out at the target up to a range of 21 feet or in "stun gun" mode where the taser is directly placed on the body of the target. When the taser is used in "stun mode" the taser does not fully incapacitate the muscles but rather is used for "pain compliance."

3

respond. Lynch noted that "Keiser was completely oblivious to his surroundings ... there was no response verbally to anything that [Lynch] or Deputy Baker said." According to Lynch, during the entire time he was on the scene, Keiser "never said one word." At some point Keiser pulled a shiny metallic object out of his pocket and threw it to the side of the water. Deputy Baker mentioned that it could have been a knife. However, the officers agree that Keiser did not have any visible weapons on him.

The officers were now in positions approximately 20 feet to 20 yards away from Keiser, surrounding him on all sides. When Keiser again failed to respond to an order that he take his hands from his pockets, Trooper Galarneau then told Deputy Lynch to "tase him [Keiser]." Deputy Lynch gave a few more instructions to an unresponsive Keiser and thereafter fired two probes from the taser at Keiser from approximately 7 yards away.[3]FN5 One probe stuck in the exterior of Keiser's jacket while the other probe bounced off and fell to the ground. When the taser was deployed Keiser "flinched downward" and then pulled the probe off his coat and begin pulling at the wires. At this point, the officers attempted to move in on Keiser, with Baker reaching Keiser first and grabbing him by both of the arms while Galarneau hit Keiser with a baton in the legs "approximately ten (10) times with no effect." FN6[4] Deputy Lynch confirmed that there were "several" baton strikes to no effect. While Baker was still trying to maintain a hold on Keiser's arms, Keiser fell face forward, forcing himself and Baker into a "semi-prone" position in the water. Keiser had his face just above the water at that point with his hands underneath him holding his head and face out of the water. The depth of the water was later measured by police technicians at 10 3/4 inches and the depth of the water and sediment at 20 and ½ inches. Trooper Galarneau was "kneeling on the suspect's waist area" with Deputies Lynch and Baker on each side of Keiser. Trooper Cardoza and Deputy Schuster were observing the struggle from the side.

While Keiser was facing downwards towards the water in a push-up type position with his arms supporting the weight of his body, with Trooper Galarneau on Keiser's back holding one handcuffed arm, and Deputy Baker holding onto Keiser's other arm, Deputy Lynch moved in with the taser in "stun mode" and applied it directly to the back of Keiser's leg at the tibial nerve. When the trigger on the taser is pulled, a charge is emitted for approximately 5 seconds. Keiser had no obvious reaction to this stun. Fourteen seconds after the first stun, Lynch stunned Keiser a second time on the bare skin of his back. After the second stun, Keiser arched his back and groaned but failed to give his un-cuffed hand to the officers. Lynch then applied the taser to Keiser's brachial plexis region. Although Deputy Lynch states that he only shot the taser four

---

[3]FN5. This is the farthest distance from which the taser should be shot. The taser manual states "never fire the advanced taser at a target more than 21 feet away" and the optimal range is 7-10 feet.

[4]FN6. Trooper Galarneau offers a different version of events than both Lynch and Baker, who both testified that Baker made the first contact with Keiser by grabbing him at the wrists. In his deposition, Galarneau asserts that he made the first contact with Keiser when he struck him with a baton. He then states that Keiser turned and came at Galarneau and that at this point Galarneau grabbed Keiser and the other officers jumped in to help.

times (once using the probe aimed at Keiser's chest and three times in stun mode), the taser records show that it was deployed against Keiser a total of five times in a span of one minute and thirty-seven seconds. FN7[5]

Deputy Lynch then noticed that Keiser's face was under water up to his ear level. He informed the other officers that Keiser's face was underwater but the other officers were busy trying get Mr. Keiser's hands out from under him. Lynch then holstered his taser and attempted to pull Keiser's head out of the water by his hair. Deputy Baker also noticed that Keiser's face was, at one point, submerged to his hairline for approximately 10-15 seconds. Lynch stated that Keiser resisted having his head pulled out of the water and when he was unable to pull Keiser's head out of the water he released it.  At this time, Keiser had only one arm underneath him for support, an officer on his back and another officer holding his other arm, and he was being stunned with the taser.

Eventually, the officers were able to handcuff Keiser's other arm and drag him out of the water onto dry land. Shortly thereafter, the officers noticed that Keiser was not breathing and that he had a "blue tint to his lips." The officers began chest compressions and breaths until an ambulance arrived. The EMS squad suctioned a "substantial amount" of water, leaves, twigs and mud out of Keiser's airway. Keiser was pronounced dead upon arrival at the hospital. Two autopsy results, one conducted by the county, and one ordered privately by the plaintiff, reported finding thick mud in Keiser's airway and lungs, and concluded that he had died as a result of drowning.

*Landis v. Baker*,  297 Fed. Appx. 453, 455-458 (6th Cir. Oct. 16, 2008)

## ANALYSIS

### I.    Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue of material fact regarding the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v.*

---

[5]FN7. The State's autopsy report identified what appeared to be taser marks on the front of Keiser's thigh which may account for the fourth recorded activation of the taser

*Catrett*, 477 U.S. 317, 322 (1986); *Martin v. Ohio Turnpike Comm'n*, 968 F.2d 606, 608 (6th Cir.1992).

In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987).  The Court is not required or permitted, however, to judge the evidence or make findings of fact.  *Id.* at 1435-36.  The moving party has the burden of showing conclusively that no genuine issue of material fact exists.  *Id.* at 1435.

A fact is "material" for purposes of summary judgment if proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties.  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984).  A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Accordingly, when a reasonable jury could not find that the nonmoving party is entitled to a verdict, there is no genuine issue for trial and summary judgment is appropriate. *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir.1993).

Once the moving party carries the initial burden of demonstrating that there are no genuine issues of material fact in dispute, the burden shifts to the nonmoving party to present specific facts to prove that there is a genuine issue for trial.  *Anderson*, 477 U.S. at 256.  To create a genuine issue of material fact, the nonmoving party must present more than just some evidence of a disputed issue.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  As the United States Supreme Court has stated, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the [nonmoving party's] evidence is

6

merely colorable, or is not significantly probative, summary judgment may be granted."
*Anderson*, 477 U.S. at 249-50 (citations omitted); *see Celotex*, 477 U.S. at 322-23;
*Matsushita*, 475 U.S. at 586-87.

Consequently, the nonmoving party must do more than raise some doubt as to the existence of a fact; the nonmoving party must produce evidence that would be sufficient to require submission of the issue to the jury. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir.1995).

II.   Law of the Case Doctrine

Under the law of the case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case" and "findings make at one point in the litigation become the law of the case for subsequent stages of that same litigation." *Wysong v. City of Heath*, 260 Fed. Appx. 848, 852 (6th Cir. 2008) (internal citations omitted). The defendant asserts that the law of the case applies here because, in affirming the district court's denial of qualified immunity to the defendants, the Sixth Circuit has already held that there are material issues of fact that preclude summary judgment.

The Court agrees with the plaintiff that the law of the case doctrine does not apply here. The Sixth Circuit was considering the defendants' motion for summary judgment on the issue of qualified immunity when it held that there were material issues of fact. In denying the defendants' motion, the district court and the Sixth Circuit held that the plaintiff had met her burden of coming forth with sufficient facts from which a jury could determine that the defendants violated the plaintiff's decedent's clearly established constitutional

7

rights.  The case is in an entirely different posture here, and the Court must now consider

whether there are material issues of fact that preclude summary judgment for the plaintiff

when considering the evidence and inferences in the light most favorable to the defendant.

The previous orders never ruled on the sufficiency of the defendant's evidence to show

material issues of fact and therefore the law of the case doctrine does not apply.

III.   Is summary judgment appropriate on liability?

The plaintiff has moved for partial summary judgment on liability.  In her motion, the

plaintiff argues that the undisputed facts, confirmed by both the defendant's admissions

and the previous orders of the district court and the Sixth Circuit, show that Galarneau

violated Charles Keiser's constitutional rights and committed the tort of assault and battery

and that no reasonable jury could conclude otherwise.

The Constitution prohibits "unreasonable" searches and seizures.   Claims of

excessive force in an arrest are analyzed under the Fourth Amendment "reasonableness"

standard.  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  The question in the instant case

is whether the defendant's use of force to arrest the decedent was objectively reasonable.

The same analysis governs the question of whether the defendants committed an assault

and battery under state law.  *Landis v. Baker*, 297 Fed. Appx. at 465.

In the Sixth Circuit, courts faced with an excessive force case that involves several

uses of force must analyze the claims separately. *Gaddis v. Redford Twp.*, 364 F.3d 763,

772 (6th Cir. 2004) (quoting *Dickerson v. McClellan*, 101 f.3d 1151, 1162 (6th Cir. 1996)

(other citations omitted)).  They should "identif[y] the seizure and procee[d] to examine

whether the force used to effect that seizure was reasonable in light of the totality of the

circumstances, not whether it was reasonable for the police to create those circumstances."

*Id.* The court may, however, consider the moments preceding a use of force as part of the context of that use of force. *Id.*

"At the summary judgment stage . . . once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party . . . the reasonableness of [an officer's] actions . . . is a pure question of law." *Walters v. Stafford*, 317 Fed. Appx. 479, 491 (6th Cir. 2009) (quoting *Scott v. Harris*, 550 U.S 372, 380 n.8 (2007))

A. Does the Sixth Circuit Opinion Affirming the Denial Of Summary
   Judgment to Defendants Mandate Judgment as a Matter of Law to Plaintiff?

As a threshold matter, the Court must address the unusual legal posture of the present motion for summary judgment, following as it does the Sixth's Circuit's opinion addressing the defendants' previous motion for summary judgment on the grounds of qualified immunity. The cases on unlawful force establish that the question of objective reasonableness is a question of law. Often there are factual disputes as to what precisely happened during the alleged unlawful force: for example, did the plaintiff attack the police officer or not? There are few such disputes in this case.

The facts here are largely undisputed and the Sixth Circuit has already found that the facts could, if proved, constitute unlawful force. The question therefore arises whether the precedent established by the Sixth Circuit in this case this require this Court to determine as a matter of law that a constitutional violation occurred, or, conversely, if the reasonableness of the force here is still a question for the jury.[6]

---

[6] At the hearing on this matter, the Court asked the parties to submit supplemental briefs citing unlawful force cases in which the court granted summary judgment for the plaintiffs. The plaintiff has cited two cases in which the court has granted summary judgment to the plaintiffs in an unlawful force case. The first, *Gardner v. Memphis Police Dept.*, was a grant of summary judgment against a *municipality* on the grounds that the actions of the individual officers, who shot an unarmed, fleeing suspect in the back, had already been determined to be unconstitutional and were done pursuant to the municipality's written policy. *Gardner v. Memphis Police Dep't*, 8 F.3d 358 (6th Cir. 1993). In the second case,

The Court concludes that the Sixth Circuit opinion affirming the denial of qualified immunity to defendants does not mandate a grant of summary judgment to the plaintiff. While the plaintiff is correct that most of the facts in the present case are undisputed, there are several factual material factual disputes, including whether Keiser lunged at Galarneau and the number of times Galarneau struck Keiser with his baton. There are also various inferences that a jury would be entitled to draw on the undisputed facts, which inferences must be drawn in favor of the defendant on plaintiff's motion for summary judgment. Specifically, here a jury could interpret the largely undisputed facts as either suggesting that Keiser was still highly dangerous, and therefore the police response was justified, or a jury could interpret the undisputed facts as suggesting that Keiser was no longer dangerous, because he was surrounded by four police men, and was not trying to escape or aggressively resist arrest, and therefore the police response was not objectively reasonable. The Sixth Circuit opinion drew all permissible inferences in favor of the plaintiff, and did not consider the question of excessive force where the inferences from the

---

*Beecham v. City of Sacramento*, Slip op. 07-1115 (E.D. Cal. Oct. 22, 2008), an unreported decision from the Eastern District of California, the court held that an officer used excessive force as a matter of law when he forced a passenger in a stopped car at gunpoint to lift her shirt. Neither case speaks to the issue at hand and neither is therefore persuasive. The other cases cited by the plaintiff do not involve unlawful force claims and therefore are inapplicable. For example, *Estate of Owensby v. City of Cincinnati*, 385 F. Supp. 2d 616 (S.D. Ohio 2004), *aff'd on other grounds,* 414 F.3d 596 (6th Cir. 2005), is a denial of medical care claim, not on an unlawful force claim. The remaining cases cited by the plaintiff involve illegal search and seizures.

The parties have also directed the Court to cases in which a court has found that facts may establish excessive force as a matter of law. *See Adams v. Metidva*, 31 F.3d 375, 386 (6th Cir. 1994) (continuing spraying of mace into eyes of suspect already incapacitated by mace excessive); *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988) (nightstick blow to handcuffed, incapacitated individual excessive). The Court, however, has found no case, and the parties were unable to cite to any, in which a court granted summary judgment to a plaintiff because it found as a matter of law that an officer's use of force was objectively unreasonable in circumstances factually similar to the ones at issue here.

undisputed facts were drawn in favor of the defendant, as is necessary here. The Court therefore will proceed to determine whether summary judgment is appropriate based upon the facts in the record, construed in the light most favorable to the defendant.

B. Do the facts warrant a finding as a matter of law that Officer
   Galarneau Used Excessive Force In Arresting the Plaintiff's Decedent?

There are three different uses of force that are claimed to be excessive here. The plaintiff claims that defendant Galarneau is liable for excessive force for striking Keiser on the leg with a baton, for Officer Lynch's use of the taser on Keiser, and for Keiser's drowning. Under *Dickerson*, each use of force should be analyzed separately. Since the Court is evaluating plaintiff's motion for summary judgment, it must determine whether, viewing the evidence and drawing all inferences in the light most favorable to the defendant, there exists material issues of fact that preclude summary judgment for the plaintiff.

A. Use of the baton

The plaintiff asserts that "there exists no genuine issue of fact that, without communicating with the other officers and in what can only be described as an unprovoked attack, Defendant Galarneau rushed Mr. Keiser from behind and hit him with approximately 10 baton strikes." Plaintiff's Motion for Summary Judgment at 20. The defendant argues that there are material issues of fact both as to the number of times Officer Galarneau struck Mr. Keiser and as to whether the use of the baton was objectively unreasonable.

The Court finds that the defendant has demonstrated a genuine issue of material fact as to the reasonableness of Galarneau's use of the baton. While, as pointed out in the Sixth Circuit opinion, a reasonable jury could conclude that Galarneau used excessive force in striking Keiser in the leg hard enough to cause severe bruising while he was unarmed and surrounded by four officers, there is also evidence in the record from which a

11

reasonable jury could conclude that the force was not constitutionally excessive.  Taking the evidence in the light most favorable to Galarneau, the jury would be entitled to consider the evidence that Keiser had successfully resisted two officers and attempted to strangle Galarneau only a few minutes before and could reasonably conclude that Keiser did in fact still pose a threat to the officers or others, and that Galarneau's striking Keiser with the baton was a reasonable attempt to deal with the threat in a manner short of using deadly force.  Further, Galarneau testified that he only struck Keiser once with the baton, and the Court must credit this testimony on plaintiff's motion for summary judgment.  For these reasons, the Court finds that there is a genuine issue of fact as to whether Galarneau's use of the baton constituted excessive force, and the Court will deny plaintiff's motion for summary judgment on this basis.

    B.  <u>Use of the taser</u>

Deputy Lynch was the only officer present who used a taser on Keiser.  Since Lynch is no longer a party to this action, the question before the Court is whether the evidence establishes as a matter of law both that Lynch's tasering of Keiser was constitutionally unreasonable force and that Galarneau is responsible for Lynch's use of the taser.

In rejecting defendants' motion for summary judgment on the grounds of qualified immunity, the Sixth Circuit held that there was evidence from which a jury could find that the use of the taser was excessive and that Galarneau was liable for the use of the taser:

> There is evidence that Trooper Galarneau, who requested backup from a patrol car with a taser, encouraged and agreed with the use of the taser employed against Keiser. Deputy Lynch testified that Trooper Galarneau yelled for Lynch to "tase" Keiser.  Both Baker and Galarneau were holding onto Keiser in the water at the time that Lynch was deploying the taser, and saw Lynch do so.  A reasonable jury could conclude that they had the means and opportunity to prevent the harm to Keiser.

*Landis v. Baker*, 297 Fed. Appx. at 464.  The plaintiff extrapolates from this to argue that no reasonable jury could conclude that Galarneau was *not* liable for excessive force.  This,

however, goes beyond what the Sixth Circuit ruled.  In determining that the defendants were not entitled to qualified immunity, the Sixth Circuit and this Court considered all evidence and viewed all inferences in the light most favorable to the plaintiff, who was the non-moving party.   Here, however, the Court must draw all inferences in favor of Galarneau, who is the non-moving party on plaintiff's motion for summary judgment. Viewed in this way, there is evidence from which a reasonable jury could find either that the use of the taser by Lynch was not unreasonable or that Galarneau was not constitutionally responsible for Lynch's use of the taser.  A reasonable jury could conclude that the use of the taser was reasonable based on the evidence put forward by the defendant that Keiser had only minutes before attempted to strangle one officer, that he successfully overcame and evaded two officers, that the previous attempts to subdue him had no effect, and that he had no apparent reaction to the first use of the taser.  Further, a jury would be entitled to conclude on the facts in the record that Galarneau had little control over Lynch's use of the taser and little opportunity to intervene in the chaos surrounding Keiser's apprehension. Viewing the facts in the record in the light most favorable to the defendant,  the Court concludes that there are genuine issues of fact that preclude summary judgment in favor of the plaintiff on the use and reasonableness of the taser.

C.  Drowning

In considering the defendants' motion for summary judgment on the issue of qualified immunity, the Sixth Circuit held that there was evidence from which a reasonable jury could conclude that the actions of the officers during Keiser's arrest forced Keiser's head under the water causing him to drown.  The plaintiffs now move for summary judgment arguing that the evidence shows as a matter of law that Galarneau's actions were objectively unreasonable and caused Keiser's drowning.

13

The Court finds that there are genuine issues of material fact regarding Galarneau's liability for Keiser's drowning. First, while the plaintiff asserts that the defendant's actions either forced Keiser's head under water or deprived him of the ability to keep his head out of the water, the statements of all the officers appear to agree that Keiser deliberately placed his own head under the water. There is no testimony that Keiser was tasered while his face was submerged, and Deputy Lynch unequivocally states that he did not deploy the taser while Keiser's face was submerged. Given this testimony, there is a factual issue as to whether Keiser's drowning was due to the actions of the defendant as opposed to the actions of the other officers or of Keiser himself, and whether Galarneau should have anticipated and could have prevented the drowning. Summary judgment is therefore inappropriate on Galarneau's liability for Keiser's death.

## ORDER

For the reasons stated above, it is hereby **ORDERED** that plaintiff's motion for summary judgment (docket no. 73) is **DENIED**.

s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: December 14, 2009

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on December 14, 2009, by electronic and/or ordinary mail.

Alissa Greer
Case Manager

14